May it please the court, we're going to divide time, I believe, five minutes for each appellant and then reserve five minutes in general for a reply. All right. We'll try and keep track of the time. Very good. May it please the court, Burke 1L on behalf of Paula Roberts and counsel. The only issue presented for review in Ms. Roberts' case is whether or not there was sufficient evidence in the record to sustain conviction under subsection A1 of the crack house statute. As the court's aware, and Tam is, this court decided that it was insufficient under subsection A1 to substitute the intent of another party in order to uphold a conviction under subsection A1. Let me ask you just what my concern is here and maybe you can help me. So there is, we know there's some evidence that she knew that her boyfriend was dealing in drugs. Clearly. And there was evidence that she was present in the house or in the apartment. And there's evidence that she was with him when he purportedly made a sale. Down the street. Down the street, in the car. Correct. There was some evidence that there was money in her purse or in a purse in the car. Correct. And she was the only woman in the car. That's correct. There was some evidence that there was a book which has been characterized, a notebook which I don't know if that's correct or not, but with her name in the book. And one page was, I believe the record indicates one page was testified to as a drug ledger. Although the agent testified he couldn't determine from anything in there who wrote it. Right, okay. Now my question is this. Taking those facts, why couldn't, and she lived at the place with her daughter. Is it a reasonable inference for a jury to make that one of her purposes in maintaining this residence was to allow her boyfriend to sell drugs? I don't think that that's the question that's pertinent in this case. Because if you look at the Tamas case, that gentleman was a landlord. He was convicted under both subsections A1 and A2. And in throwing out the conviction under subsection A1, the court said it's insufficient that he knew or maybe was fine with someone selling drugs out of his apartment, even though he didn't reside there. The primary question was whether it was his purpose to sell drugs. And Verners, the Tenth Circuit case, clarifies that distinction in a way that's very analogous to this case. Verners was a mother. Her son was the drug dealer. There was, I believe the record or the case indicates 100 ounces of crack cocaine in the microwave. 100 ounces of crack cocaine wouldn't fit in a microwave, but it was 100 grams. That's still a significant chunk of crack. And the court found that it didn't matter that she knew the son was a drug dealer dealing drugs out of the house. It didn't even matter if maybe she had some involvement. The question was whether it was her purpose to use the facility as a drug distribution point or place for packaging drugs. Now, does she have to be the one who is packaging the drugs? I think that's what Verners says. And subsection A-2 is the sort of vicarious liability statute where you're on the hook for what other people do if it's sort of a knowing. You're knowing what their purpose is. But she wasn't charged with that. She was charged under subsection A-1, and so it's materially distinguishable. I don't quite understand what you're saying. She has to be actually packaging the goods themselves? I think the Verners court sort of gave out a sort of a list of facts in Verners' case that were good. One of them was she was not managing or supervising the operation. The court actually said she might have had some involvement. Yeah, but that didn't set up what another court might find was sufficient under the act. It was just pointing out what wasn't there in that case. What it highlighted, Your Honor— that the jury could, it seems to me, logically say this was a drug business and she was keeping drug records. Her name was in it. Her handwriting was in it. That seems more than just knowing things are going on. I don't think that's what the record indicates, Your Honor. In fact, directing the court to page 78 of the excerpt, when cross-examined on the ledger, which is the only evidence in the record about the ledger, by the way. The government cites its own argument. But Special Agent Schmidt was queried about it. He testified that on the drug ledger, which is the page in question, first of all, he did no handwriting analysis of anything. So they don't really know who wrote anything. There's no signature on the page. The question, there's no identifiers, and this continues on to page 79. There's no identifiers as to who wrote that, correct? No, sir. The signatures are on the other pages. Question, so there was no handwriting analysis done on the drug ledger page, correct? Answer, no, sir, there was not. There's no experts going to come in and tell us who wrote that in comparison with any of these defendants' handwriting, correct? Not that I'm aware of. That's pretty much the record. But what did he testify to? Who testified that it was her handwriting? Special Agent Schmidt testified that. The cross-examination was very well done, but that doesn't mean the jury couldn't believe it, that he identified her handwriting. Are you saying that couldn't be? Nobody did identify handwriting. Pardon? Nobody identified anybody's handwriting. There was a statement made that there was a drug ledger, that Ms. Roberts' name appeared in it, but there was no evidence in the record on who put, signed anything, wrote anything, and the record's devoid of any evidence to that effect. Where in the record is where the government put in the drug record? Somewhere in Special Agent Schmidt's testimony, I believe. I don't believe there's a great deal of testimony about the contents of that document. How do you deal with her involvement in the drug operation out of the car? Your Honor, the evidence indicates that Ms. Roberts was subsequently determined to be driving Roderick Williams' car. He gets out of the car. Special Agent Schmidt testifies he sees Williams go over to another truck, do something in the truck. He didn't see anything change hands. He saw Roderick Williams' hands go into the truck. Something happened. There was already a warrant for Roderick Williams' arrest for drug dealing, so he inferred that Roderick Williams completed some sort of drug transaction. Subsequently, he gets in the vehicle with Roberts. There's a stop. They check the purse. There's money in the purse. There's money on him. The two sums add up to $3,200. But there's no testimony that anyone saw Roberts handle the money. If it is her purse, there's no testimony that the money went to her and then in the purse. There's certainly no testimony that she went and was a part of the transaction. And there's also evidence in the record, it's not in the excerpt, but if the Court wanted to plumb the record for more reasonable conclusions you can draw from this, there was a lot of evidence that Roderick Williams was involved in other illicit activities under the term nightlife, which I think was code for prostitution. There's no evidence in the record that suggests that this was a drug deal. It happened blocks away from the residence in question. Are you saying that the jury could not draw an inference from this, a legal inference from this that it was a drug deal? No, Your Honor. I don't believe that there's sufficient evidence, but even assuming that they could, if you could put a good enough shine on the evidence to say that's a drug deal, she was driving the car, that's not enough evidence under Verners to convict her of maintaining a place for drug purpose because that just shows some limited involvement as Verners, the mother, might have had some involvement. There are several things, but you would not exclude the jury's ability to consider that as part of the evidence? Sure, and looking at the evidence in the light most favorable to the government, they can consider that along with all the other evidence, but under subsection A-1, there's a different standard of proof for mens rea than there is under subsection A-2. A-1, it's got to be her purpose, which means she's got to be the drug dealer, not somebody else, and the government has, I think, accurately characterized the record with respect to the two relationships. Roderick Williams is a drug dealer. Paula Roberts is a drug dealer's girlfriend. That's what the record shows. I find it a little hard to see the difference between A-1 and A-2, the way you put it. A-1 is unlawful to knowingly open, and so forth, and so forth, for the purpose of manufacturing or using any controlled substance. So the defendant has to be knowing and have a purpose in what he's doing, and in A-2, it's to unlawful to manage or control any place knowing and intentionally make available for use the place for the purpose of unlawfully manufacturing, and so forth. So both parts of the statute require intention, and they both require purpose. And what's the difference? Well, as the court in Tamas pointed out, if there is no difference, then Congress clearly enacted two subsections that merge and overlap, and since they can't have done that, the court decided that subsection A-1 applied to the offender's purpose. In other words, the offender is the drug dealer, and subsection A-2 was the vicarious liability provision where someone else's drug purpose is sufficient, as long as you're running the facility knowingly. And so Tam is on point on that very distinction. You might want to set your time now. Sure. Good morning, Your Honors, and may it please the Court. My name is John Farr, and I represent Byron Williams. The only issue we briefed from his trial and conviction was the idea that the charges are multiplicious, that the conspiracy, the overt acts alleged in the conspiracy are almost word for word, verbatim, the same as the offenses charged. Count one as the conspiracy, counts two and four are completed offenses, and five and six are attempts. Under the Blockberger test, of course, the test for multiplicity and indictment is whether each separately violated statutory provision requires proof of an additional fact, which the other does not. Now, that seems simple enough on the surface, but it's not applied scientifically or ministerially, and that's what gets us into the idea that these counts should be considered multiplicious. The Taylor Court in a footnote addressed the fact that 21 U.S.C. Section 846 addresses, quote, unquote, attempt or conspiracy. So conceptually, it makes sense. And I would point out that Roderick Williams, co-defendant, prevailed on this issue when it came to an attempt, and I would commend for the court's reading Magistrate Roberts' recommendation on that point, which appears starting at page 45 in the excerpt as very well reasoned and thought out, and Roderick Williams prevailed on that point. The government says that it didn't respond to that, and that's sort of how it came to be, but the simple fact is that Magistrate Judge Roberts didn't leave anything to chance in that decision. This next issue is whether the court should have, quote, unquote, considered it. Mr. Williams, Byron Williams' attorney, brought it up at the trial and said the court should grant that motion, saying it's the same as Roderick Williams' motion, but the court said, well, I'm going to deny it without prejudice at this time. In my terminology in my brief, that wasn't considering it. I meant that the court should consider it on the merits right then and there. The government in its brief says that I'm mistaken that the court did consider it, but I meant considering it on the merits. So I'm going to, in the interest of time and deferral to my co-defendant, co-counsel, learned co-counsel, I'm going to stop there and ask the court to take a close look at whether these counts are multiplicious. Thank you. Okay. Thank you. May it please the Court, I'm Allison Mendel for co-defendant Roderick Williams. I have never been involved in a criminal case where thinner evidence was presented in support of a conspiracy. My client was not convicted of possessing drugs, selling drugs, buying drugs. He was convicted of conspiracy, and the evidence that ties him to this conspiracy in this case is almost nonexistent. The primary evidence against him, in fact, is hearsay statements of co-conspirators, which cannot on their own stand to connect him to the conspiracy. I think it's telling that the government in its brief relies on facts like he and defendant Byron Williams both like Cadillacs, and they both went to Seattle. If the government requires those sorts of facts to tie Mr. Roderick Williams to the conspiracy, the evidence of his ties to this conspiracy are extremely thin. What's your objection to the testimony of the co-conspirators? That there's no other evidence. What's wrong with that?  What's wrong with the co-conspirators' testimony? There's no other evidence that ties him to the conspiracy except the hearsay testimony of his co-conspirators. And what's wrong with that? There was no evidence presented that he was a member of the conspiracy and that they were, in fact, co-conspirators. You first have to tie him to the conspiracy in order to make those people co-conspirators. You say there's no evidence of that. Is that your objection? Yes. But if there is evidence, then you have no objection. Well, I think... Is that right? Yes. Right. The evidence against Mr. Roderick Williams with respect to the purchase and sale of cocaine, what evidence there is relates only to the purchase and sale of cocaine, not to his participation in this conspiracy. So the fact that, for example, he had a set of scales in his car could tie him to some other conspiracy or his own project or whatever, if anything. But facts like that do not tie him to this conspiracy. Neither does it tie him to this conspiracy that some particular person at some time alleged to have bought drugs from him. That doesn't tie him to this conspiracy. Those acts standing alone are not things he's charged with. We have the same problem with the car stop, which I agree that the car stop standing alone is extremely thin evidence that that was a drug purchase or sale of any kind. Nothing was observed to change hands. No cocaine was found in his car. If you believe that was a drug transaction, you also have to believe that he sold all of the cocaine that he had in his possession at that time. And, of course, the person to whom he allegedly sold it was apparently never located. It just simply isn't enough even to establish that he sold drugs, much less that he sold drugs that were related to this conspiracy. I would also rely on portions of my co-counsel's argument with respect to the maintaining drug premises, except I certainly don't concede that Mr. Roderick Williams was the drug dealer and Ms. Roberts was simply his girlfriend. The evidence that the primary purpose or a principal purpose of living in that apartment with his girlfriend and her child was for the distribution of drugs. The evidence of that is very, very thin. It consists of the paraphernalia that was found in the apartment and the testimony of one witness that she'd been there at some drug party and purchased drugs perhaps once. The question isn't whether the evidence is very thin. The question is whether there's sufficient evidence for a jury to make a finding. I understand that, Your Honor. And if that's all it takes to establish that a premises comes under the statute, then any person charged with any drug violation seems to be at risk of being charged with maintaining a premises because it's simply he lived there and someone testified that he dealt drugs. And that's what the evidence is. And it's difficult to see how any residence of any person who uses drugs could possibly be not a drug premises under that if that's all it takes to violate the statute. And I don't think that's what Thomas says. I think it says principal or primary purpose. It doesn't say that, does it? I think it does. I think that it also relies on the Fifth Circuit case of Chen to say that it has to be a primary purpose also. I'm sorry. I'm unable to locate the exact language, but I know that I cited it in my brief. You might have got it from a case. Right. No, no. I'm sorry. That's what I'm referring to. I'm saying that Thomas says that and Thomas quotes Chen as saying that as well. So the case really indicates it was, but I don't know whether they make it a read it in as a requirement of the statute. That's another question. Well, anyway, we get your point. Oh, I'm not sure I understand the clock here as it relates to all of this, but I think that I'm out of time unless there's. Are you through? Pardon me? Is there something else you want, another point you wish to make? No, Your Honor. You had a sentencing issue, but you're not going to pursue. Well, I have a sentencing issue that in my argument is contrary to existing Ninth Circuit precedent. I intend to pursue the issue, but I understand that this panel is not in a position to overrule Mercado. May it please the Court. Crandon Randell, assistant U.S. attorney. I tried this case. I would like to address first the sufficiency of the evidence issue with regard to Roderick. Seems to be the primary issue with regard to him. And I would suggest that the record shows that there were at least four co-conspirators that testified in this case, the most important of which was the lady who was in charge of the Seattle operation of this drug operation. Her name was Inez Lomax Hassan. She had a relationship with the main character in this case, Byron Williams. And what set him apart from his partner, Roderick Williams, was that Byron had the source of supply in Seattle, and he's the one that bankrolled getting that cocaine up here to Anchorage. Lomax Hassan had a relationship with her. She organized and managed the Seattle side of the operation. She recruited couriers. She obtained the cocaine that was going to ship. She scheduled flights, et cetera, et cetera. She also traveled to Alaska, and she also took cash from the drug operation back to Seattle to purchase more product. She testified to a couple of very important things in this case that go directly to the establishment of an agreement between Roderick Williams and Byron Williams and as to their relationship as being a conspiracy. And the first thing she said on one occasion when she was transporting money back to Seattle between $25,000 and $35,000, she was told by Byron Williams that half of this money came from Roderick to pay for his share of the drugs that were going to be shipped in the future. So he's a partner with Williams, and that's what Williams said. Secondly, another thing she testified to in this court was the fact that Byron, being the main guy here and bankrolling this operation, complained about the fact that Roderick wasn't paying his fair share of the expense money, which is a standard complaint, I imagine, of a businessman. But it certainly shows the relationship between the two, and it certainly shows the existence of a conspiracy. We had another guy testify by the name of Kevin Washington, Kelvin Washington. And he was one of the guys at the airport in August of 2006 when Lomax Hassan's daughter, Latonya Stuckey, who was recruited as a courier, she came in on an Alaska flight with half a kilo of cocaine strapped to her, and Kelvin Washington was there in Roderick Williams' car to meet her. Also present at the airport at that time after midnight in another car was Byron Williams. So three of these guys show up to meet this particular courier on this particular night and the night she got caught. And Washington, although he had difficulty with portions of his testimony, did concede in the record, certainly as a result of his plea to conspiracy, that he knew that the woman coming in on the plane was a drug courier. And I would submit if he knew it, the guy next to him knew it, the driver of the car, which was Roderick Williams. So they're all there together waiting for the cocaine. There was evidence that Roderick was there in the car as the driver? Well, yeah, it was Roderick's car. Who was driving? You said you said. All right. I assume I assume that Roderick was driving his car. I don't know that. I know this. Washington got out of his car, walked over or got out of Roderick's car, walked over and engaged the agent in a little bit of conversation, found out the guy was an agent, got back in the car, and it left very fast. Now, I don't know who was driving it, but it was Roderick's car because the agent recognized the car when he arrested Roderick on this street deal in December, a few months later the same year. Also, with regard to the conspiracy, we have the testimony of two separate couriers, Stuckey and Shirley Cockerock, that they were present at the Ninth Avenue residence of Byron Williams when cocaine arrived. They brought it. And when cocaine arrived, the guys that sell it on the street that are waiting for it arrived to get their share. And two separate witnesses testified that Roderick showed up to get his package, his share of the cocaine for his own distribution. That tends to corroborate the existence of certainly an agreement between both Williams. I get it. I sell it to you. You sell it to your people. Now, the Cadillac deal, the card deal, is only important because it shows the relationship, not necessarily drug-related, but it shows a relationship between Byron and Roderick, which is separate and apart from the drugs, except for one little thing. The evidence also showed that one of the addresses that Roderick used on one of his card documents, and he stayed at Lomax Hassan's place in Seattle while he was buying his car. He was there for a couple of days. And this is in May of 2006. So everything is happening in this year of 2006. One of the addresses he used was an address of one of Byron Williams' family members. The agent testified it was either his mother or his grandmother. An unconnected, a drug-unconnected address here in the city of Anchorage. Roderick felt free to use that address. And, of course, so did Byron on one of his card documents, a proof of insurance document. So they both used a neutral address unconnected with the drug, the drug business, which I would suggest shows an association between the two, common interest and common need for protection. So I would submit that when you look at the totality of the circumstances, that a jury could certainly draw the inference reasonably that Roderick was engaged in a conspiracy with Byron Williams and others to distribute drugs. We had several of the members of the conspiracy that testified to that fact. That's my, as far as the sentencing issue, I don't think there's any issue there. As far as the maintaining count against Roderick, I would submit that unless there are questions from the court. Now, I want to talk about Paula Roberts a little bit. I think there are some very definite distinctions to make between Paula Roberts' situation living with Roderick Williams than with the Verners case. On the Verners case, as I recall, it was a situation where this woman was living in an apartment with her two children. Her son was running a drug business or conducting a drug business of one sort or another out of part of the apartment, but not the whole thing. He was using primarily, I think, his bedroom. I'm sorry? What difference does that make? What's significant about that? Well, the court found a difference. No, I'm asking you. All right. The difference in that case is that his business could have been separate and apart from her direct exposure, not that she didn't know. She apparently knew about it. Yes, I agree. But in this case, the drug transactions and the drug paraphernalia were found in the open, accessible areas of the apartment. In other words, she not only knew what he was doing with regard to dealing, she was right there. And it was testified to that she was there on numerous occasions in two separate locations, on 11th Avenue and 34th, while he dealt drugs out of the residence. Her name is also on the lease, and that was testified. You said while he dealt drugs out of the residence. Out of the residence. But he was on 34th and what was the other street? 11th. And that's out of the residence? There was testimony that one of the co-conspirators, Shirley Kakaroff, went to the residence on 11th Avenue for the purpose of buying drugs from him. And she was there, and that's in the record. She also went to the residence on 34th, and she elaborated on that, described a big glass table, and went to that residence on a number of occasions, and she was there for that. Her name is on the lease. And then, of course, you have the drug ledger. Now, that book was introduced because she identifies herself in that book, at least in one communication. I, Paula Roberts, lied to the police. I read that to the jury. I didn't go into a lot of detail. There were different things in there. But one of them was the drug ledger that had monetary amounts associated with weight amounts of cocaine, ounces. I can't find that in the record where that occurs. I looked at your citation from your brief. What part is this, Judge? It takes me over to page 97, but I can't find where in the record the notebook is described. It's described very sparingly. It's described very sparingly. Well, I have to have more than very sparingly. Is there anything? You say that it's got this statement in it. Is it only the exhibit that I need to get to? Yes, you do. And no one's called for the exhibits? Nobody has called for the exhibit, but the exhibit is available if necessary because it's in evidence. Well, where is it that you introduce it into evidence? Where does that take place? My one citation here that I made a note of is trial transcript one, page 98. I assume it's... 97 is your citation, the red brief. It's six. And I went to 97 and I can't find it. I would have to locate that. I shouldn't bring the trial transcript with me. But obviously it went into evidence, and I just can't find it. Was it admitted for all purposes? It was admitted... The limitations imposed on its admission? I'm sorry? Was it admitted just without restriction? Yes. Tell me about, aside from her name being on there, I lied to the police or something, what else is there in that to connect her to the notebook? There were other communications in there, but directly, proof-wise, to definitely prove it, it was not proven. It was not shown. The only thing that I saw that had her name on it was where she wrote a letter where she identified herself. So that was it. And there was nothing about handwriting? No. And you say that it was identified as a drug record. Was there a record of drug transactions in it? There was a guide. An amount of money equals one ounce. Breakdowns of how much money is charged for pieces of an ounce. Okay. Quarter ounce, eight ball. So it's not a record of sales, it's just costs? A reference, correct. A reference of costs. And what you would charge. And where is that notebook now? I would assume it's in the possession of the DEA. And I take it as something that you can give back? I would assume so. Would you mind doing that and sending it to the clerk of the court of the Ninth Circuit for us to look at? I can do that. Now you have to show, as I understand, as Judge Noonan was trying to discuss with counsel, there is a distinction between the A and B sections of the statute? You mean A-1 and A-2? Yes, A-1 and A-2. Yes. Now you brought this under A-1, correct? Correct, A-1 and B. I think they're very close. And as I understand the statute, you had to show that in maintaining this place, her purpose was sale, distribution, manufacturing of drugs. Correct. Purpose and intention. Right. Or a primary purpose of that location was to do that. Now, there is very little evidence that she was directly involved in the sale of drugs. That is correct. As I went through with counsel, there certainly is good circumstantial evidence, probably even direct evidence, that she knew that he was engaged in the sale of drugs. Correct. How does that all get to the point or to establishing the fact that it was her purpose to maintain this place as part of that statute? You know, there's also evidence that she rented it. They lived there. Her daughter lived there. Those are residents. Yes, there's no question. The way you make that connection, I do it two ways, or I think about it in two ways. First, all this guy did was sell drugs. She lived with him. They had a child together. Well, they didn't live together. Okay. But what ices it is the fact that she participated with him in the car incident. She was part of that deal. Counsel forgot to mention that as part of that little drug transaction, she drove around the block. She dropped him off. He did his deal. She left, drove around the block smart. She's gone from the scene, then comes back and picks him up. The money is in her purse on the console. The scales are there. I would submit that that shows an active participation by her. I think you could say that, but does it show that when she was living with him and her daughter in the house that that was her purpose? I mean, let's say you tried to convict her of drug dealing. You might have a shot at it, but how does that bear on what she was doing in the apartment? You say all he did was sell drugs. He was living with her. They were having ordinary relations between each other. They were human beings. It doesn't mean that the thing was there just to sell drugs. So how do we know that was her purpose? I think that the decisive factor in what she knew and what her purpose was and what her intention was. We know what she knew. She knew that drugs were being sold. The only question is what was her purpose? I think that's shown. I would submit that that is shown by her participation with him on the drug transaction. I don't see how you make the inference. Well, I think that's what I assume. That's the jury. You do the jury. I just put the facts out there that I had, and they decided it. Looking at the ledger, which we're going to get. That ledger is awfully ambiguous. It is. So what does it mean when somebody says she lied to the police? I don't know what that means. Well, that's her name. No, it's her name. Somebody writes in there that she lied to the police. What does it mean? Directly nothing. Nothing? It just identifies her as being the author. That's all. It identifies her as what? As being the author and the owner of the book. Why does it identify her that way? Well, that's an inference that could be drawn. Why didn't you have a handwriting expert say it's her handwriting? We did not do that, Judge. No. Wasn't done. You know, when you look at this case, it seems like it would have been more appropriate, and I realize this is all prosecutorial discretion and whatnot, but to charge her under the A2 section. Knowing it might have been. That she knew of the activity and allowed it to continue. I don't see if there's necessarily that much difference between the two. I don't see much difference. I don't think you're convicted on either. Well, I have nothing else to offer on the issue of Paula Roberts. I'm going to take before you can get that notebook to us. I'll try and get it today. All right. We're going to be here through Wednesday. If it's possible to get it over here today or tomorrow, it would help us to review that before we get through. I take it counsel has no objection. You have one other defendant. Yes. Unless the court has questions about Byron, I have nothing to add to that. I think it's pretty clear from the record that the issue of multiplicity is not an issue at all in this case, and I have nothing to add to it. It's covered thoroughly in the brief. Okay. Thank you. Thank you. All right. Let's see. Now we have time for rebuttal, if I remember correctly. There was about ten minutes left. All right. This is Burke 1L again. Taking everything that the government's trying to submit, they demonstrate knowledge. If knowledge was sufficient to convict under subsection A1, A1 and A2 would merge. That's the whole point of TAMAS. That's the whole point of Vernors. And I think Vernors is a good case to look at closely because it's an example of how obvious the knowledge can be, and you're still not guilty under A1. There's a huge chunk of crack in a microwave oven. In this case, we have her there when things go on. The police showed up in Vernors and found a huge chunk of microwave in the family microwave. Knowledge isn't enough under subsection A1. And maybe Congress could have drafted it different, but they didn't. And since it was brought under subsection A1, you have to show purpose. And Vernors shows that even some involvement, even maybe driving somebody somewhere while they go be a drug dealer, that's not good enough. It has to be your purpose to be a drug dealer under subsection A1 out of the place. Vernon didn't have anybody driving. No, it didn't. It had the mother there in the residence. The son didn't live there full time, but he certainly conducted illicit activities out of there, including a large-scale operation in the kitchen. And in this case, we didn't even have proof of a large-scale operation. We just had it's a family residence. There's trace amounts found on the table. Ms. Kekarik testified at least on one occasion to going over there. Trace amount found underneath the table. Scales were out. Dirty grime. In the Silex, there was cocaine. It was pretty well spread around. Sure, but there was no actual substance there, and there was no money found. So it's hard to gauge the size of the operation that was going on. Clearly, in Berners, we have a tremendous – I think it was a misprint. I think it's 100 grams of crack cocaine. That's a lot. There's evidence that there was drug dealing right there. There's no question about that, and that she knew about it. That isn't the situation you have in the Tenth Circuit case. But what – if I understand your argument, is that she can be there as an innocent spectator and that they have to prove her purpose was involved. That's correct. And you don't think that they measured up with enough to go to the jury? Tam is very clear on the distinction between those two subsections. A2, it's okay if you sublet an apartment to someone and you know they're going to sell crack, but you're not the crack dealer. You're guilty under subsection A2. Under subsection A1, it has to be your purpose. And Chen and Tam are very clear on that. Thank you. Any other rebuttal? Briefly, Your Honor. Your Honor, I think the government actually succeeded in making my argument for me because their position seems to be that the evidence tying my client to the conspiracy is two secondhand hearsay statements by an alleged co-conspirator that someone else thought he was a member of the conspiracy. And that a person that he was with at the airport knew that there was a conspiracy but did not testify that my client knew or was a member of the conspiracy. And in response to the judge's questions about the airport, there were two cars at the airport and the car that picked up the drug courier was the car with Mr. Byron Williams' car and he was in it and he was driving it. Kelvin Washington and my client were in a second car that did not pick up the courier. They didn't actually speak to Byron Williams nor did they speak to the courier. Kelvin Washington spoke to the DEA agent. So that's... Yeah, it was just coincidence that they were all out at the airport together? No, I believe the testimony was that Mr. Washington wanted to go there to see if he could find Byron Williams for some reason or another. He was leaving town. He wanted to say goodbye to him. I can't remember what the testimony was, but he said he was there to find Byron Williams not to pick up a drug courier. And there was no testimony by anyone that my client knew that there was a drug courier to be picked up or that he was there to pick her up. Although, no, that's not right. The courier later testified that she thought my client was going to pick her up, that someone else told her that. And I take it you're saying that the jury couldn't draw any inference from that? Well, you know, I think the jury can draw an inference from a multiplicity of circumstances, but none of those pieces of evidence tie my client to a conspiracy. And he wasn't... There's nothing except the hearsay to tie him to the conspiracy. The hearsay, for example, of Ms. Duckey saying that she thought my client was supposed to pick her up. The independent evidence that my client participated in the conspiracy is what's missing. And I would note that although the government argues about the testimony of Kekarik and Stuckey, that they observed my client receiving drugs for distribution is not what they testified to. They testified that they saw my client at Mr. Byron Williams' home at a time when he was distributing drugs. They never said anything about quantity. They never said anything about conversations about distribution. They never said anything other than my client was there at the time drugs were being distributed. That was the sum total of their testimony about those incidents. I have nothing further to say. Okay. Thank you very much. We appreciate your arguments. The matter will be submitted. I gather there was no further rebuttal from... No, okay. All right. The matter will be submitted. Thank you. And we'll be... We should have some telephone. All right. Go ahead. I've got to give this to the... Yeah, I've got to take care of some stuff. This is for them. The U.S. Attorney walked out without them. Thank you, sir. The next circuit is now starting to turn.
judges: Wallace, Noonan, Paez